IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ERIE COUNTY EMPLOYEES             §
RETIREMENT SYSTEM,                §
Individually, on Behalf of       §
All Others Similarly Situated,   §
and Derivatively on Behalf of    §
Nominal Defendant Nabors         §
Industries, Ltd.,                §
                                 §
        Plaintiff,               §
                                 §
v.                               §
                                 §    CIVIL ACTION No. H-11-4052
                                 §
EUGENE M. ISENBERG, WILLIAM T.   §
COMFORT, JOHN V. LOMBARDI,       §
JAMES L. PAYNE, ANTHONY G.       §
PETRELLO, MYRON M. SHEINFELD,    §
MARTIN J. WHITMAN, JOHN          §
YEARWOOD, and NABORS             §
INDUSTRIES, LTD.,                §
                                 §
        Defendants.              §

<u>MEMORANDUM AND ORDER</u>

        Pending is Defendants' Joint Motion to Dismiss (Document No.
11).  After carefully considering the motion, response, reply, and
the applicable law, the Court concludes that the Motion should be
granted and Plaintiff's complaint should be dismissed.

## I.  <u>Background</u>

        Plaintiff  Erie  County  Employees  Retirement  System
("Plaintiff") filed this Verified Class Action and Shareholder
Derivative  Complaint  against  Eugene  M.  Isenberg,  William  T.

Comfort, John V. Lombardi, James L. Payne, Anthony G. Petrello, Myron M. Sheinfeld, Martin J. Whitman, and John Yearwood (collectively, "Director-Defendants"), directors of the nominal defendant Nabors Industries ("Nabors" or "the Company"), alleging breach of fiduciary duties in approving excessive compensation for the Company's Chief Executive Officer ("CEO") and Chairman of the Board, Eugene M. Isenberg ("Isenberg"), as well as Anthony G. Petrello ("Petrello"), Nabors's President and Chief Operating Officer ("COO").[1]

Nabors is reported to be "the largest drilling contractor in the world and one of the largest land well-servicing and work over contractors in the United States and Canada."[2]   Isenberg became Chairman and CEO of Nabors in 1987 when it was emerging from Chapter 11 bankruptcy proceedings.[3]   The creditors' committee negotiated Isenberg's employment agreement,[4] which was approved by various parties to the bankruptcy proceedings and confirmed by the bankruptcy court.

Petrello was appointed President and COO in 1991, at which time his employment agreement was entered into "after arm's length

---

[1] Document No. 1 ¶¶ 2-5 (Orig. Complt.).

[2] Id. ¶ 28.

[3] Id. ¶ 30.

[4] Id.

negotiations  with the Board . . . ."[5]  Both employment agreements allegedly "provided for Isenberg and Petrello to receive cash bonuses calculated by a formula based on a percentage of the Company's cash flows."[6]  As the Company grew and prospered, the compensation owed to Isenberg and Petrello increased commensurately pursuant to the agreed-upon formula.[7]

In 2009, the Compensation Committee--which is tasked with "oversight of [executive compensation] agreements and consideration from time to time of such amendments, modifications, and or extensions of such agreements as may be necessary or desirable"[8]-- retained an independent compensation consultant, BDO Seidman, to "assist in the identification and analysis of appropriate elements and levels of executive compensation, including specifically the evaluation and propriety of the compensation arrangements currently in effect for Messrs. Isenberg and Petrello."[9]  This review led to new employment agreements that substantially "reduced Isenberg's and Petrello's salaries and death/separation benefits," but which

---

[5] Id. ¶ 31.

[6] Id. ¶ 32.

[7] Id.

[8] Id. ¶ 24(1).

[9] Id. ¶ 34.

Plaintiff alleges were still excessive.[10]   As part of the new agreements, effective April 1, 2009, Isenberg would receive $100 million (down from $263.63 million) and Petrello would receive $50 million (down from $89.6 million), upon such respective officer's death or termination from the Company without cause.[11]

The Company announced on October 28, 2011, that it had replaced Isenberg as CEO, triggering the $100 million termination payment that is the central focus of Plaintiff's Complaint, but that he would continue as Chairman of the Board.[12]   Three weeks later Plaintiff filed this suit.

Plaintiff complains that excessive compensation was agreed to be paid to the officers and alleges that Isenberg's compensation "was significantly disproportionate to compensation paid to CEOs of peer companies and to shareholder returns."[13]  When the Company in 2011 held an advisory, non-binding vote on its compensation program pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"),[14] 57% of the Company's shares voted against the Company's compensation program, but the Board allegedly

---

[10] Id. ¶ 39.

[11] Id. ¶ 38.

[12] Id. ¶¶ 47-48.  Petrello was appointed the new CEO.

[13] Id. ¶ 43.

[14] 15 U.S.C. § 78n-1(c).

ignored this "say on pay" vote.[15]   Plaintiff further alleges that
some shareholders advanced proposals to adopt a "pay-for-superior-
performance" compensation policy in 2007, which the Board rejected,
and to declassify the Board in 2010 and 2011.[16]   Plaintiff alleges
that "it was not until November 1, 2011 that the Board announced
that it would propose a bye-law amendment to declassify the Board
to be voted upon at the Company's 2012 annual meeting of
shareholders."[17]   On February 6, 2012, the company announced that
Isenberg agreed to forego the $100 million termination payment
under his employment agreement.[18]

Defendants move to dismiss Plaintiff's derivative claims
pursuant to Fed. R. Civ. P. 12(b)(1), arguing that Plaintiff lacks
standing to sue based upon Bermuda company law and the English rule
announced in 1843 in Foss v. Harbottle, 2 Hare 461 (Eng. 1843)
which, except in very limited circumstances, generally bars
derivative claims from being filed by shareholders.   Defendants
also move to dismiss Plaintiff's statutory oppressive conduct claim

---

[15] Document No. 1 ¶ 56.

[16] Id. ¶ 58-60.   The bye-laws provided for election of
directors by plurality vote, for three-year terms.

[17] Id. ¶ 60.

[18] Document No. 11 at 3.   Although this $100 million obligation
is at the heart of Plaintiff's Complaint, its relinquishment has
not ended the case: Plaintiff complains that Isenberg received
other excessive compensation and that Petrello still has a contract
with the company that provides a $50 million payment upon his
termination without cause.   See Document No. 42 at 2, 5-8.

asserted under the Bermuda Companies Act of 1981, contending that Plaintiff fails to state a claim under that Act for which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).[19]

## II.  Legal Standards

A.  Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a party can seek dismissal of an action for lack of subject matter jurisdiction.  FED. R. CIV. P. 12(b)(1).  Standing to sue is an "essential component[] of federal subject matter jurisdiction." McCall v. Dretke, 390 F.3d 358, 361 (5th Cir. 2004).  "The party invoking federal jurisdiction bears the burden of establishing" its standing.  Steel Co. v. Citizens for a Better Env't, 118 S. Ct. 1003, 1017 (1998).  The question of subject matter jurisdiction is for the court to decide even if the question hinges on legal or factual determinations.  *See* Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001).

The Fifth Circuit distinguishes between "facial" and "factual" attacks to subject matter jurisdiction.  Paterson v. Weinberger, 644 F.2d 521, 523 (5th Cir. 1981); *see also* Irwin v. Veterans

---

[19] Defendants Comfort, Lombardi, Whitman, and Nominal Defendant Nabors also moved to dismiss for lack of personal jurisdiction under Rule 12(b)(2) but, taking heed of the parties' agreement, the Court first considers the 12(b)(1) and 12(b)(6) motions.  *See* Document Nos. 34 & 36.  Defendant Comfort withdrew his motion to dismiss under Rule 12(b)(5).  *See* Document No. 41.

Admin., 874 F.2d 1092, 1096 (5th Cir. 1989). A facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence, challenging the court's jurisdiction based solely on the pleadings. *See* Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990); Paterson, 644 F.2d at 523. A factual attack, on the other hand, involves submission of evidence extrinsic to the complaint. Paterson, 644 F.2d at 523. In response to a factual attack, the "plaintiff is also required to submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction." Paterson, 644 F.2d at 523; *see also* Irwin v. Veterans Admin., 874 F.2d 1092, 1096 (5th Cir. 1989). In sum, a court evaluating a motion to dismiss pursuant to Rule 12(b)(1) may consider (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. Hartford Ins. Group v. Lou-Con Inc., 293 F.3d 908, 910 (5th Cir. 2002). Here, Defendants essentially make a facial attack on Plaintiff's Complaint.

B.   Rule 12(b)(6)

Rule 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When a district court reviews the sufficiency of a

complaint before it receives any evidence either by affidavit or admission, its task is inevitably a limited one. *See* Scheuer v. Rhodes, 94 S. Ct. 1683, 1686 (1974). The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff is entitled to offer evidence to support the claims. Id.

In considering a motion to dismiss under Rule 12(b)(6), the district court must construe the allegations in the complaint favorably to the pleader and must accept as true all well-pleaded facts in the complaint. *See* Lowrey v. Tex. A&M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997). To survive dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). While a complaint "does not need detailed factual allegations . . . [the] allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 127 S. Ct. at 1964-65.

C.   Application of Foreign Law in Federal Court

> A party who intends to raise an issue about a foreign
> country's law must give notice by a pleading or other
> writing.  In determining foreign law, the court may
> consider any relevant material or source, including
> testimony, whether or not submitted by a party or
> admissible under the Federal Rules of Evidence.  The
> court's determination must be treated as a ruling on a
> question of law.

FED. R. CIV. P. 44.1.  This rule provides courts with broad authority
to conduct their own independent research to determine foreign law
but imposes no duty upon them to do so.  *See* Carey v. Bahama Cruise
Lines, 864 F.2d 201, 205 (1st Cir. 1988)("[Rule] 44.1 empowers a
federal court to determine foreign law on its own, but does not
oblige it to do so."); Bartsch v. Metro-Goldwyn-Mayer, Inc., 391
F.2d 150, 155 n.3 (2d Cir. 1968) (Friendly, J.) (same).

The parties agree that Bermuda law governs,[20] and each has
offered declarations of well-credentialed legal experts in Bermuda
and/or English law to assist the Court in correctly determining and
applying Bermuda company law to the facts pled in this case.[21]

---

[20] Nabors is incorporated under the laws of Bermuda and
therefore, under Texas law, Bermuda law governs this dispute.  *See*
TEX. BUS. ORG. CODE § 1.102; *see also* id. § 1.105.

[21] Defendants advance the opinions of Geoffrey R. Bell ("Bell")
of Paget, Bermuda, and Robert Miles, Q.C. ("Miles") of London,
England.  Bell qualified as a solicitor in England in 1968 and was
called to the Bermuda bar in 1973.  Document No. 14, ex. A
[hereinafter "Bell Decl."] ¶ 2.  He was later appointed Queen's
Counsel for Bermuda in 1992 and Puisne Judge of the Supreme Court
of Bermuda in 2005.  Id. ¶ 3.  He retired from the bench in 2009
and has since been active in arbitrations and has acted as an

Pursuant to Rule 44.1, the Court has considered other relevant materials and sources as well.

### III.  Discussion

#### A.  Standing to Bring Derivative Claims

Bermuda follows the "rule in _Foss v Harbottle_," which holds that the proper plaintiff in a suit addressing a wrong done to a company is the company itself.  _See_ _Clark v. Energia Global Int'l, Ltd._, [2001] S.C. 173 at 10 (Berm. Sup. Ct.)[22] ("A fundamental

---

expert witness on Bermuda company law.  _Id._  Bell has also submitted a second declaration attached to Defendants' Reply.  _See_ Document No. 46, ex. A [hereinafter "Bell Second Decl."].

Miles was appointed Queen's Counsel in London in 2002 and specializes in company, commercial and business law.  Document No. 15, ex. B [hereinafter "Miles Decl."] ¶ 2.  Miles has practiced law for over 23 years in England and has personal experience in Bermuda law, having appeared in Bermudian courts and advised Bermudian clients.  _Id._ ¶¶ 3-4.  He has also submitted a second declaration attached to Defendants' Reply.  _See_ Document No. 46, ex. B [hereinafter "Miles Second Decl."].

Plaintiff presents the opinions of Robin Hollington, Q.C. ("Hollington") of London, England, and David Robert Kessaram ("Kessaram"), of Hamilton, Bermuda.  Hollington was appointed Queen's Counsel in 1999 and has practiced Chancery litigation in London for over 30 years, with particular experience in shareholders' disputes.  Document No. 42, ex. 1 [hereinafter "Hollington Decl."] ¶ 1.  He was appointed a Recorder to hear civil cases in 2004 and is the author of _Shareholders' Rights_ (Sweet and Maxwell 6th ed. 2010).  _Id._  Kessaram is the managing partner of Cox Hallett Wilkinson Ltd. and has practiced commercial litigation in Bermuda for the past 35 years.  Document No. 42, ex. 3 [hereinafter "Kessaram Decl."] ¶ 1.

[22] Hereinafter "_Energia Global_."

principle of Bermuda law is that a company has its own legal personality, that is separate and distinct from its shareholders, owns its own property and acts in its name in creating obligations and liabilities." (citation omitted)); *see also* <u>City of Harper Woods Employee's Retirement System v. Olver</u>, 589 F.3d 1292, 1299 (D.C. Cir. 2009) (applying pre-2006 English company law).   On matters of common law, "the Courts of Bermuda will accept as binding decisions of the House of Lords."  Bell Decl. ¶ 6 (quoting <u>Crockwell v. Haley</u>, [1993] Bda LR 7 (Berm. C.A.)); *see also* <u>In re Tyco Int'l, Ltd.</u>, 340 F. Supp. 2d 94, 96 (D.N.H. 2004) (looking "primarily to English common law to resolve questions" of Bermuda company law); Miles Decl. ¶ 3.

Under English common law, the plaintiff bears the burden of establishing standing to bring a derivative suit.   *See, e.g.*, <u>Prudential Assurance Co. Ltd. v. Newman Indus. Ltd. (No. 2)</u>, [1982] Ch. 204 (C.A.) 210-211 (appeal taken from Eng.)[23] (in order to proceed with a derivative suit, a plaintiff must "establish a prima facie case . . . that the action falls within the proper boundaries of the exception to the rule in <u>Foss v. Harbottle</u>").   The English Court of Appeals explained the rule in <u>Foss v. Harbottle</u> thus:

> The classic definition of the rule in <u>Foss v. Harbottle</u> is stated in the judgment of Jenkins L.J. in <u>Edwards v. Halliwell</u>, [1950] 2 All E.R. 1064 as follows. (1) The proper plaintiff in an action in respect of a wrong

---

[23] Hereinafter "<u>Prudential (No. 2)</u>."

> alleged to be done to a corporation is, prima facie, the corporation. (2) Where the alleged wrong is a transaction which might be made binding on the corporation and on all its members by a simple majority of the members, no individual member of the corporation is allowed to maintain an action in respect of that matter because, if the majority confirms the transaction, cadit quaestio; or, if the majority challenges the transaction, there is no valid reason why the company should not sue. (3) There is no room for the operation of the rule if the alleged wrong is ultra vires the corporation, because the majority of members cannot confirm the transaction. (4) There is also no room for the operation of the rule if the transaction complained of could be validly done or sanctioned only by a special resolution or the like, because a simple majority cannot confirm a transaction which requires the concurrence of a greater majority. (5) There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue.

Prudential (No. 2) at 210-211.  Likewise, in its adherence to the rule in Foss v. Harbottle, Bermuda law does not permit shareholder derivative suits unless an exception to the rule applies:  (1) if the alleged wrong is ultra vires; (2) if the alleged wrong requires a special majority to ratify; (3) if the alleged wrong infringes a shareholder's personal rights; or (4) if the alleged wrong qualifies as a "fraud on the minority."  Tyco, 340 F. Supp. 2d at 98 (citing Edwards v. Halliwell, [1950] 2 All E.R. 1064 (C.A.) at 1066 (Eng.)); City of Harper Woods, 589 F.3d at 1299-1300; see also Prudential (No. 2) at 210-211.  The fourth of these recognized

exceptions, according to the Supreme Court of Bermuda, requires the shareholder "first [to] satisfy the Court that wrongdoer control coupled with 'fraud on the minority' exists." Energia Global at 10.[24]

Plaintiff argues that its excessive compensation claims fall within two exceptions to the rule in Foss v. Harbottle, first the recognized exception of "fraud on the minority," and second, what Plaintiff argues is the exception of "unfair prejudice." Plaintiff also contends that English law would consider a "flexible" procedure to allow its derivative action to proceed "where such a technicality [of applying the exceptions to Foss v. Harbottle] would lead to manifest injustice,"[25] and invokes a sort of overarching "interests of justice" argument. Defendants reply that there are no "unfair prejudice" or "interests of justice" exceptions under Bermuda law.

1.   "Fraud on the Minority"

To make a prima facie case that there has been a fraud on the minority, which is a recognized exception to the rule in Foss v. Harbottle, a plaintiff must show: (1) "Defendants have, in breach of their fiduciary duty, committed fraud; that is, they have taken

---

[24] Plaintiff does not contend that any of the first three recognized exceptions applies.

[25] Document No. 42 at 11.

advantage of their position to commit the company to transactions that benefit themselves at the expense of the company" and (2) "Defendants were in control of the company for all practical purposes." City of Harper Woods Emp. Ret. Sys. v. Olver, 577 F. Supp. 2d 124, 135 (D.D.C. 2008), *aff'd*, 589 F.3d 1292, 1303 (D.C. Cir. 2009); *see also* Tyco, 340 F. Supp. 2d at 99; Bell Decl. ¶18. Plaintiff has not pled facts sufficient to satisfy either of these elements.

      a.   "Fraud"

"Fraud" in the context of "fraud on the minority" is not actual fraud but instead is self-dealing "in which control is misused to benefit the wrongdoers at the company's expense." Tyco, 340 F. Supp. 2d at 99 (citing Konamaneni v. Rolls Royce (India) Ltd., [2002] 1 W.L.R. 1269, at 1278 (Eng. Ch. 2001); Estmanco (Kilner House) Ltd. v. Greater London Council, [1982] 1 All E.R. 437 (Ch. 1982)); *see also* Energia Global at 10 ("'[f]raud on the minority' means there has been some element of misappropriation of company property").

Plaintiff argues that the Director-Defendants breached their fiduciary duties by approving excessive compensation agreements for Isenberg and Petrello, and that this is the "fraud" required for the "fraud on the minority" exception.  Plaintiff also alleges, however, that the Compensation Committee engaged an independent

consulting firm, BDO Seidman, for expert advice on the employment
contracts with Isenberg and Petrello, which helped to obtain terms
substantially more favorable to the Company, and that the new
agreements were made pursuant to the Company's bye-laws.  In other
words, the Compensation Committee and the Board, with independent
consultant assistance, did what the bye-laws charge them to do.
There is no allegation that any Compensation Committee member was
engaged in self-dealing or acted in bad faith or for improper
purposes; in fact, it is uncontested that the 2009 renegotiation
saved the company more than $163 million in potential obligation to
Isenberg, and more than $39 million in potential obligation to
Petrello.[26]   Plaintiff does not allege that either Isenberg or
Petrello was a member of the Compensation Committee or that either
played any role in the Company's decision-making process and its
offer of the substantially reduced terms for their continued
employment.

Again, and most importantly, there is no allegation that any
of the Compensation Committee members personally benefitted from
the decision to approve the contracts, or any other allegation of
self-dealing on the part of the committee members.  *See, e.g.*,
Daniels v. Daniels, [1978] Ch. 406 at 414 (Eng.)[27] (no fraud on the
minority in a case where "the powers of the directors were

---

[26] Document No. 1 ¶ 38 (quoting the 2011 Proxy).

[27] Hereinafter "Daniels."

15

effectively wielded not by the director who benefitted but by the majority of independent directors who were acting bona fide and did not benefit"); Tyco, 340 F. Supp. 2d at 101 (directors in control are not the same as those who benefitted); Bell Second Decl. ¶ 13 ("[T]he 'fraud on the minority' test is not met where, as here, the directors on the Compensation Committee did not benefit personally from the acts complained of."). In sum, although Plaintiff conclusorily asserts that "the Individual Defendants have abused their power by granting excessive compensation to Isenberg and Petrello, both of whom are current directors of the Company, at the expense and to the detriment of the Company,"[28] Plaintiff does not allege that the employment contracts were the product of self-dealing either by the members of the committee that approved them or by Isenberg or Petrello, who are not alleged to have participated in or to have had control over the Company's decision.[29] Plaintiff has not raised claims of "fraud" or of self-

---

[28] Document No. 42 at 13.

[29] Likewise, the Director-Defendants' opposition to filing a derivative suit against themselves, where they do not own or control a majority of the Company's shares, is not self-dealing by those Defendants such as to make a prima facie case for fraud on the minority. The court in Tyco rejected that very argument:

> Nor can a board's decision to prevent the company from suing its directors qualify as improper self-dealing. The directors of a corporation always have an interest in avoiding the personal liability and damage to their reputations that could result from a breach of fiduciary duty lawsuit. If allegations of this sort could satisfy the self-dealing component of a fraud on the minority

dealing under Bermuda law such as to state a "fraud on the minority" exception to the rule in Foss v. Harbottle.

b.   Control

The "fraud on the minority" exception also requires the presence of a subgroup of wrongdoers who have control of the company or are in the majority, and Plaintiff fails to show this as well. *See* Burland v. Earle, [1902] A.C. 83 at 93 (Can.)[30] ("But an exception is made to [the rule in Foss v. Harbottle] where the persons against whom the relief is sought themselves hold and control the majority of the shares in the company, and will not permit an action to be brought in the name of the company."); *see also* Daniels (allowing a derivative suit by plaintiffs to proceed against the defendants who held the majority of shares, where one of the defendants bought company property at less than fair market price and thereby benefitted at company expense); *see also* Winn v. Schafer, 499 F. Supp. 2d 390, 398 (S.D.N.Y. 2007) (applying English common law to a Cayman Islands company dispute and holding that plaintiff failed to "allege that these defendants hold a

claim, the requirement would be meaningless because it would be satisfied in every derivative action in which a breach of fiduciary duty claim is asserted against a sitting board of directors.  Such an interpretation defies both precedent and reason and must be rejected.

340 F. Supp. 2d at 100 (citations omitted).

[30] Hereinafter "Burland v. Earle."

controlling number of the company's shares or that they exercise *de
facto* control over those shares" or engage in "conduct sufficient
to establish the requisite self-dealing" and that therefore
plaintiff did not "establish either of the requirements to invoke
the fraud on the minority exception").

Plaintiff does not contest that the Director-Defendants
collectively owned and controlled fewer than 14% of the voting
shares—nowhere near a majority--and that Isenberg and Petrello did
not exercise control over the Compensation Committee. "Control,"
as was observed by the Court of Appeal in <u>Prudential (No. 2)</u>,
"embraces a broad spectrum extending from an overall majority of
votes at one end, to a majority of votes at the other end made up
of those likely to be cast by the delinquent himself plus those
voting with him as a result of influence or apathy." Without any
showing of "control" by the Director-Defendants under the broadest
of definitions, Plaintiff nonetheless argues that the alleged
wrongdoers "are in control of the Company" because Plaintiff is
being "improperly prevented from bringing the action." Plaintiff
does not plead facts, however, that the Director-Defendants
controlled the company such that a majority of shareholders could
not ratify the Board's actions. *See* <u>Daniels</u> at 412 ("[I]t is
obvious that in such an action the plaintiffs cannot have a larger
right to relief than the company itself would have if it were
plaintiff, and cannot complain of acts which are valid if done with

the approval of the majority of the shareholders, or are capable of being confirmed by the majority." (quoting Burland v. Earle at 93)).

In sum, in addition to having not raised a viable claim of fraud under Bermuda law, Plaintiff has not presented a prima facie case that the Director-Defendants exercised majority control of the voting shares of the company nor that they employed such control improperly to prevent Plaintiff from bringing this action. *See* Smith v. Croft at 185 ("[i]f it is an expression of the corporate will of the company by an appropriate independent organ that is preventing the plaintiff from prosecuting the action he is not improperly but properly prevented" from bringing the action). Plaintiff has therefore failed to plead a case sufficient under Bermuda law to invoke the "fraud on the minority" exception to the rule in Foss v. Harbottle.

2.   "Unfair Prejudice"

Plaintiff contends that the Court should apply an "unfair prejudice" exception, and Hollington, Plaintiff's English law expert, advances this view with a prolix discussion of the Companies Act of 2006 [U.K.] ("2006 Act"). Plaintiff's Bermuda law expert, Kessaram, does not discuss any "unfair prejudice" exception as applying in Bermuda, and Bell, Defendants' Bermuda law expert, forthrightly states that there is no exception to Foss v. Harbottle

as a matter of Bermuda law on the basis of "unfair prejudice."
Bell Second Decl. ¶ 2.  Hollington essentially argues that the 2006
Act in England is a codification of then existing English common
law, and therefore the "unfair prejudice" exception, statutorily
laid out in §§ 994 and 996 of the 2006 Act, should be regarded as
if it were the common law.  Hollington opines that while "[t]he
2006 code undoubtedly changes the procedure which governs
derivative claims:  it is almost *deliberately opaque* as to whether
it actually changes the substantive principles which underlie the
availability of such claims."  Hollington Decl. ¶ 27 (emphasis
added).  Miles, in reply, observes that Hollington in his book[31] did
not find the 2006 Act "opaque" about substantive changes, but
declared that "the 2006 Act *is clearly intended to make some
substantive changes to the law* and procedure . . . ."  Miles Second
Decl. ¶ 8 (emphasis added).[32]  That the 2006 Act did include
substantive changes appears to be supported by the greater weight
of authority and hence, Plaintiff's arguments on the "unfair
prejudice" statutory remedy under the 2006 Act in England for
*direct* shareholder claims is of virtually no value in an analysis
of Bermuda law regarding exceptions to <u>Foss v. Harbottle</u>'s common

---

[31] ROBIN HOLLINGTON, SHAREHOLDERS' RIGHTS 132 (6th ed. 2010).

[32] Other commentaries also have observed that the 2006 Act made
substantive changes in the common law in England.  *See*, *e.g.*, DAVID
CHIVERS AND BEN SHAW, THE LAW OF MAJORITY SHAREHOLDERS POWER USE AND ABUSE 192
(Oxford 2008).

law bar of *derivative* claims.   *See* Bell Second Decl. ¶¶ 2-10 (explaining that there is no "unfair prejudice" exception to the rule in <u>Foss v. Harbottle</u> in Bermuda law and that the 2006 Act does not represent Bermuda law).

In sum, the Court is not persuaded that under Bermuda law there is an "unfair prejudice" exception to the rule in <u>Foss v. Harbottle</u>.

3.   <u>"Interests of Justice"</u>

Plaintiff also urges the Court to consider the "totality of the circumstances" and allow its derivative claims to proceed "in the interests of justice."[33]   Plaintiff's expert, Hollington, principally relies on Judge Vinelott's opinion in <u>Prudential v. Newman Industries (No. 1)</u>, [1981] Ch. 257,[34] to argue that a derivative claim may be brought "if the interests of justice" require it.   As Defendants point out, <u>Prudential (No. 1)</u> was reversed in part on appeal in an opinion in which the appellate court explicitly criticized the notion of a separate "interests of justice" exception.   *See* <u>Prudential (No. 2)</u> at 221 ("The second observation which we wish to make is merely a comment on Vinelott J.'s decision that there is an exception to the rule in <u>Foss v. Harbottle</u> whenever the justice of the case so requires.   We are not

---

[33] <u>Id.</u>, at 11, 12.

[34] Hereinafter "<u>Prudential (No. 1)</u>."

convinced that this is a practical test."). Chief Judge Barbadoro, in construing Bermuda law in Tyco, "share[d] the skepticism expressed by the Court of Appeal about the viability of a distinct interests of justice exception," although under the allegations in Tyco he found it unnecessary to determine if a Bermudian court would ever recognize such an exception. See Tyco, 340 F. Supp. 2d at 102 (Barbadoro, C.J.); see also City of Harper Woods, 589 F.3d at 1304 ("Finally, Harper Woods has not proven the existence of an 'interests of justice' exception to the Foss rule."); Bell Second Decl. ¶¶ 2-10; Miles Second Decl. ¶¶ 26-27. Based on the greater weight of legal authority, this Court is not persuaded that the courts of Bermuda would recognize an "interests of justice" exception to the rule in Foss v. Harbottle, and most surely not under the facts pled in this case. In sum, Plaintiff has failed to plead facts that fall within an exception to the rule in Foss v. Harbottle, and Plaintiff's alleged derivative claims (Counts I, II, and III) will be dismissed.

B.   Direct Claim for Oppressive Conduct

Section 111 of the Bermuda Companies Act of 1981 provides:[35]

**Alternative remedy to winding up in cases of oppressive or prejudicial conduct**

---

[35] Hereinafter "1981 Act." In its Complaint, Plaintiff invokes 1981 Act § 111 as its basis for asserting its claim for oppressive conduct. See Document No. 1 ¶ 26.

111 (1) Any member of a company who complains that the affairs of the company are being conducted or have been conducted in a manner oppressive or prejudicial to the interests of some part of the members, including himself, or where a report has been made to the Minister under section 110, the Registrar on behalf of the Minister, may make an application to the Court by petition for an order under this section.

(2) If on any such petition the Court is of the opinion-

(a) that the company's affairs are being conducted or have been conducted as aforesaid; and

(b) that to wind up the company would unfairly prejudice that part of the members, but otherwise the facts would justify a complete winding up order on the ground that it was just and equitable that the company should be wound up,

The Court may, with a view to bringing to an end the matters complained of, make such order as it thinks fit, whether for regulating the conduct of the company's affairs in the future, or for the purchase of the shares of any members of the company by other members of the company or by the company and, in the case of a purchase by the company, for the reduction accordingly of the company's capital, or otherwise.

. . . .

1981 Act § 111.

In order to plead a direct claim for oppressive or prejudicial conduct, Plaintiff must plead facts to show (1) that the Director-Defendants' conduct has been oppressive; and (2) "that it could be

23

said that the circumstances were such that, but for the fact that a winding up order might unfairly prejudice the petitioners, it would be just and equitable to wind the company up." <u>Re Jermyn Street Turkish Baths Ltd.</u>, [1971] 3 All ER 184, 200 (Eng. C.A.)[36] (applying Companies Act 1948 § 210, England's version of Bermuda's 1981 Act § 111);[37] *see also* Bell Decl. ¶ 22; Kessaram Decl. ¶ 70. "If a director of a company were to draw remuneration to which he was not legally entitled, this might no doubt found malfeasance proceedings or proceedings for some kind of relief, but it would not, in our judgment, of itself amount to oppression." <u>Jermyn Street</u> at 199.

Here, as observed above, Plaintiff alleges that the Director-Defendants approved excessive compensation packages for Isenberg and Petrello, but Plaintiff also pleads that these agreements were fully disclosed to shareholders and in SEC filings. Plaintiff makes no showing that the employment agreements were illegal, ultra vires, or beyond the scope of the bye-laws of the company. Plaintiff alleges only that the fully disclosed actual remuneration agreed to by the Compensation Committee, even after obtaining the

---

[36] Hereinafter "<u>Jermyn Street</u>."

[37] As to interpretation of statutes, the Bermuda court will follow decisions of the English courts in cases where Bermuda has adopted identical statutory language from England. Bell Decl. ¶ 9. 1981 Act § 111 is taken verbatim from Companies Act 1948 (U.K.) § 210. *Cf.* Bermuda Companies Act 1981 § 111 *with* U.K. Companies Act 1948 § 210; *see also* Bell Decl. ¶ 11 (Bermuda's Companies Act of 1981 was largely based on the English Companies Act of 1948).

24

expertise and assistance of an independent consultant, was so excessive as to constitute a breach of Director-Defendants' fiduciary duties to the Company.  This does not meet the standard for an oppression claim.  *See* Jermyn Street at 199; ROBIN HOLLINGTON, SHAREHOLDERS' RIGHTS 250 (6th ed. 2010) ("Thus, in general, if the board has honestly and genuinely exercised the power to pay remuneration, and has not dressed up a dividend payment as remuneration, the court will not determine whether the remuneration awarded was reasonable.").

Assuming that compensation agreed to be paid to a company's two senior officers could under certain circumstances amount to oppression and prejudice to shareholders,[38] the statute appears to require that the magnitude of the offending conduct, in the context of the totality of the circumstances, be such as to warrant the Company's dissolution but for the "alternative remedy" provided by section 111.  In other words, the complainant must plead that the "circumstances were such that, but for the fact that a winding up order might unfairly prejudice the petitioners, it would be just and equitable to wind the company up."  Jermyn Street at 200 (citing Companies Act 1948 (U.K.) § 210 (2)(b)); *see also* Kessaram

---

[38] *See*, *e.g.*, Maidment v. Attwood, et al, [2012] EWCA 998 (Eng. C.A.) (finding unfair prejudice under section 994 of 2006 Act where a sole director in control of a small company awarded to himself excessive remuneration to the detriment of the minority shareholder).  In Maidment, the company was insolvent.  Id.

Decl. ¶ 70 ("I agree that in order to achieve relief under section 111 of the Act *the Plaintiffs are required to show that, were i[t] not for the existence of the statutory remedy, it would otherwise be just and equitable to wind up the Company*." (emphasis added))[39]; 1981 Act § 111; Bell Decl. at ¶ 21-22.  Plaintiff does not suggest, let alone plead facts, that the state of this publicly traded $5.3 billion oil drilling company, with an average annual net income of more than $465 million for the five years of 2006 through 2010,[40] had reached such a dire condition.  Indeed, Plaintiff does not contest Defendants' assertion that the Company should *not* be wound up on account of this excessive compensation dispute.  Plaintiff fails to state a claim for which relief may be granted under Section 111 of the Bermuda Companies Act of 1981.

C.   Whether Plaintiff Should Replead

     Plaintiff did not move to amend its Complaint, but in the closing sentence of its Response "requests leave to amend" if Defendants' Motion is granted in whole or in part.  Plaintiff has

---

[39] Kessaram adds that "there is no requirement as a matter of Bermuda procedural law for the relief claimed in the petition to include a plea that the company be wound-up," Kessaram Decl. ¶ 70, which appears accurate.  However, by the plain language of the statute and by Kessaram's own reading of it, the state of the company must be such that it would be time to wind up the company if there were not another remedy.

[40] Document No. 1 ¶ 51 at 23, ¶ 28 at 10.

offered no proposed amended complaint nor has it otherwise suggested any additional facts that could be pled. "'[A] bare request in an opposition to a motion to dismiss--without any indication of the particular grounds on which the amendment is sought, *cf.* Fed. R. Civ. P. 7(b)--does not constitute a motion within the contemplation of Rule 15(a).'" U.S. ex rel. Willard v. Humana Health Plan of Texas Inc., 336 F.3d 375, 387 (5th Cir. 2003) (quoting Confederate Mem'l Ass'n, Inc. v. Hines, 995 F.2d 295, 299 (D.C. Cir. 1993)). Moreover, Plaintiff's Complaint is a well crafted and detailed pleading of 38 pages. Plaintiff has offered support for its theories in extensive briefing in opposition to Defendants' Motion to Dismiss, and has incorporated therein the expert legal opinions and arguments of Mr. Hollington, Q.C. (53 pages in length) and Mr. Kessaram (21 pages in length), plus four additional large binders of cases and authorities. The Court is satisfied that the issues have been most thoroughly and exhaustively submitted. Plaintiff's request to replead is therefore denied. Foman v. Davis, 83 S. Ct. 227, 230 (1962).

IV.   <u>Order</u>

For the foregoing reasons, it is

ORDERED that Defendants Joint Motion to Dismiss (Document No. 11) is GRANTED, and Plaintiff Erie County Employees Retirement System's derivative claims against Defendants are DISMISSED.

The Clerk shall notify all parties and provide them with a signed copy of this Order.

SIGNED at Houston, Texas, on this 30th day of July, 2012.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE